[Crim. No. 42109. Second Dist., Div. Two. Mar. 24, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
FRATERNO FRANCISCO CABRAL, Defendant and Appellant.

COUNSEL

Robert Shapiro for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**COMPTON, J.**—A jury found defendant guilty of manslaughter (Pen. Code, § 192, subd. 2) and felonious unlawful practice of medicine (Bus. & Prof. Code, § 2053). He appeals from the judgment of conviction. We reverse.

Defendant is a licensed chiropractor. Deceased was a 21-year-old epileptic who died as a result of uncontrolled epileptic seizures which led to aspiration of stomach bile and acute pneumonia.

Prior to defendant's entry on the scene, the victim was under the treatment of a medical doctor connected with the Kaiser Hospital group. That treatment consisted principally of prescribing anticonvulsant drugs which reduced the frequency and severity of the seizures.

There was evidence offered that even with the use of medication, the victim's life expectancy was limited. On the other hand, however, it appears to be un-contradicted that the occurrence of the seizures which resulted in the victim's early death was attributable to his failure to take the prescribed medication.

Many of the facts in the case are not in dispute. The parents of the victim sought out the defendant upon a recommendation by a friend. The first contact between defendant and the victim was on May 1, 1980. During the ensuing 10 days defendant gave the victim several typical chiropractic "adjustments" of the spine. During that same period the victim took no medication.

Also during that same period victim experienced frequent and severe seizures. On May 10, 1980, victim was too weak to go to defendant's office so defendant went to the victim's house and gave him an adjustment. At that point, victim was apparently exhibiting some signs of a condition known as "status epilepticus," which is a condition of continuous seizures and which is fatal if intervening life saving measures are not taken. It seems, however, that defendant's manipulation and massaging of the victim afforded some relief and the seizure appeared to subside.

Several hours after the defendant left the residence the victim began suffering frequent and severe seizures which lasted over a period of about five hours from 6 p.m. to 11 p.m. After this series of seizures stopped the victim fell asleep. At about 5 a.m. the following morning, the victim died. Thus defendant was not present at the time the taking of emergency measures were indicated.

Defendant's contentions on appeal are essentially that he was prejudiced by the trial court's refusal to admit certain evidence and that the evidence that was produced was insufficient to support the judgment.

In order to focus on what we perceive to be the crux of the dispute it is necessary to analyze the distinction between the practice of chiropractic and the practice of medicine.

The trial court in accordance with the statutory law instructed the jury in part as follows:

A physician's and surgeon's certificate authorizes the holder thereof to practice medicine which is defined as the authorized use of drugs or devices in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, and other physical and mental conditions. (Bus. & Prof. Code, § 2051.)

The license to practice chiropractic authorizes the holder thereof "to practice chiropractic in the State of California as taught in Chiropractic schools and colleges; and also, to use all necessary mechanical, and hygienic and sanitary measures incident to the care of the body, but shall not authorize the practice of medicine, surgery, osteopathy, dentistry or optometry, nor the use of any drug

or medicine now or hereafter included in materia medica." (Deering's Annot. Bus. & Prof. Code (1976 ed.) appen. foll. § 25763 at p. 204; 3 West's Annot. Bus. & Prof. Code (1974 ed.) at p. 141.)

It is apparent that the distinction between the fields of medicine and chiropractic is based not on the type of ailment or disease from which the patient suffers but on the techniques and methods of treatment employed. Clearly there is nothing improper, according to the law of California, for a chiropractor to treat a patient who is suffering from epilepsy. Hence the defendant violated no law and the People do not contend otherwise when he administered spinal adjustments to the victim.

Further it is clear that defendant did not exceed the scope of his license in administering any other form of physical treatment. Defendant of course was not authorized to prescribe or provide medication and clearly he did neither.

The prosecution's case against defendant thus rested entirely on the circumstances under which the anticonvulsant medication was withheld from the victim. On that issue the evidence was in serious conflict.

Victim's parents testified that defendant gave assurances that he could cure the victim and insisted that the medication previously prescribed be entirely discontinued. They further testified that defendant continuously assured them that the increase in intensity and frequency of the seizures was to be expected as part of the treatment and was no cause for concern.

Defendant, on the other hand, testified that he did not interfere with or discourage the use of the medication, but merely told the parents that *he* did not and could not prescribe or administer any such medication. He testified that he advised the parents to contact their regular doctor when they expressed concern over the victim's seizures.

Patently the theory of the prosecution was that the advice to withhold the medication constituted unlawful practice of medicine as charged in count II of the information.

Involuntary manslaughter (Pen. Code, § 192, subd. 2) can be committed essentially in either of two ways, (1) a death occurring in the commission of a misdemeanor which is dangerous to life or safety, or (2) a death resulting from an otherwise lawful act performed in a criminally negligent fashion. The People elected to charge and the jury was instructed only on the latter form of involuntary manslaughter.

The information did not allege nor was the jury instructed as to just what "act" of defendant constituted the unlawful practice of medicine or the criminally negligent act which was the basis of the manslaughter charge.

As we have previously indicated, the evidence is such that the only act of defendant which could possibly support a charge of the unlawful practice of medicine was that of advising the parents to cease administering the anticonvulsant medication. That advice is also the only conduct of defendant which could be characterized as an "act" within the purview of Penal Code section 192, subdivision 2.

In support of the judgment, the People contend that in addition to the advice to withhold the medication, defendant was criminally negligent in failing to obtain "medical treatment" for the victim. Presumptively that "medical treatment" would have been the administration of the anticonvulsant medication.

The jury was not instructed on any theory of criminal liability based on a failure to act in the face of a duty to do so. The parameters of the duty of a chiropractor to affirmatively involve or procure the intervention of other disciplines in the treatment of a patient, if such a duty in fact exists, were nowhere described for the jury.

Since the defendant was not present at the time the victim lapsed into the fatal series of seizures and the parents were present, the latter were the only ones in a position to call for emergency assistance. This leads to the conclusion that the case against defendant, as we have previously observed, rests totally on whether he actively dissuaded the parents from continuing use of the medication and whether that dissuasion was effective to the extent that the parents failed to seek medical help even at a time when the victim appeared to be in extremis.

The theory of chiropractic is that various ailments and pathological conditions can be cured or allayed through manipulation of the joints and particularly the spinal column. An adjunct of that theory is that drugs and medication interfere with the natural healing processes of the body. It is no secret that the validity of the theory is generally questioned if not rejected by the medical profession. The State of California, however, has licensed the practice of chiropractic and a practitioner in the field is no more a guarantor of success than is a medical doctor.

In the absence of fraud, bad faith or a patent invasion of the field of medicine by a chiropractor, it seems to us that a criminal trial is not the proper forum for determining the validity of the theory of chiropractic. Where a person with knowledge of the consequences submits himself or herself to treatment by a

chiropractor who performs up to the standards of that discipline an untoward result, without more, should not subject the practitioner to criminal liability. (See *Kirschner* v. *Keller* (1942) 70 Ohio App. 111 [42 N.E.2d 463; Annot. 19 A.L.R.2d 1188 (1951)], where it was held that no *civil liability* attached under circumstances similar to the case at bench.)

In that vein we have serious question whether a chiropractor transgresses the limits of his license when he honestly and conscientiously advises a patient that in his opinion and according to the teachings of the School of Chiropractic, medication should be avoided. Clearly a chiropractor should not be penalized for conditioning his acceptance of a patient for treatment on the patient's agreeing to forego the use of medication which the practitioner feels would interfere with the treatment.

In *People* v. *Phillips* (1969) 270 Cal.App.2d 381 [75 Cal.Rptr. 720, 45 A.L.R.3d 105], a conviction of second degree murder was affirmed in the case of a chiropractor who treated a young girl for cancer of the eye after representing to the victim's parent that he could effect a cure. There defendant had persuaded the parent to remove the victim from the hospital and cancel a surgery which would have saved or substantially prolonged life.

The Court of Appeal, in upholding the conviction, stressed the fact that defendant, for a purely monetary motive, had *maliciously and in bad faith* made false representations to the parent and procured the victim's removal from the hospital. The court specifically noted that the jury had been instructed in the language of Penal Code section 26 subdivisions Three and Five.[1]

The *Phillips* case is distinguishable from the one at bench. No malice or evil intent has been imputed to the defendant here. The theory is simply, as stated previously, that defendant's advice that the anticonvulsant medication be withdrawn even though given in a good faith belief in the efficacy of chiropractic treatment, constituted both criminal negligence and the illegal practice of medicine.

■   Assuming without deciding the validity of the prosecution's theory, we have concluded that the judgment must be reversed because the defendant was prejudicially prevented from offering probative evidence that he did not in fact interfere with or advise against continuance of the medication.

---

[1] Penal Code section 26, subdivisions Three and Five provide: "All persons capable of committing crimes except those belonging to the following classes: . . . Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent. . . . Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence."

Defendant testified that his habit and custom in dealing with patients who are under treatment of a medical doctor was not to interfere with medication being prescribed or administered by the medical doctor.

In order to counter the testimony of the parents to the contrary, defendant offered to prove through the testimony of other patients of his that in each case he had adhered to the habit of noninterference. The trial judge refused to permit such testimony relying on Evidence Code section 1104.

Evidence Code section 1104 provides: "Except as provided in Sections 1102 and 1103, evidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion."

That section was inapplicable to the evidence proffered by the defendant. The issue was not the defendant's character with respect to skill or the quality of his conduct. The issue was whether he conducted himself on one occasion in accordance with a particular habit or custom.

The applicable law was to be found in Evidence Code section 1105 which provides: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."

Since the entire case against the defendant turned on the content of the advice given to the parents, probative evidence to support defendant's version of the conversation was crucial to the defense. In view of the closeness of the evidence and the emotional nature of the case we cannot say that a different result would not have obtained had the evidence been admitted. In our opinion, it was an abuse of discretion to reject the proffered evidence and Evidence Code section 354 will not save the judgment.

While in light of the observations which we have made earlier, we have grave reservations concerning the sufficiency of the evidence to support the judgment as to either count, in order to give the district attorney a chance to reevaluate the case and not foreclose the possibility of a retrial, we base our reversal solely on the evidentiary question previously discussed.

The judgment is reversed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied April 20, 1983, and respondent's petition for a hearing by the Supreme Court was denied June 16, 1983.